# EXHIBIT

# A

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (the "Agreement") is made as of this ___ day of March 2013, by and between the THOMAS K. LAMPERT IRREVOCABLE TRUST, an irrevocable trust established on January 9, 2012 under the laws of the Commonwealth of Pennsylvania, (the "Seller"), , TAMS MANAGEMENT, INC., a West Virginia corporation, (hereinafter "Purchaser").  Throughout this Agreement, Seller and Purchaser are sometimes collectively referred to as the "Parties" and sometimes individually referred to as a "Party".

### Recitals

**WHEREAS**, Seller is the owner of 100% of the equity and membership interests (the "Membership Interests")  of Newgate Development of Beckley, LLC, a West Virginia limited liability company ("Newgate");

**WHEREAS,** the Purchaser desires to acquire all of Newgate's right title and interest in and to the Three Marie Mine located in the Slab Fork District of Raleigh County, West Virginia, (collectively, the "**Three Marie Mine**") and to that end and for that purpose, desires to acquire the Membership Interests, (collectively, the acquisition of such mine, through the acquisition of the Membership Interests, is hereinafter referred to as the "**Transaction**");

**WHEREAS**, the Seller desires to sell all of Newgate's right title and interest in and to the Three Marie Mine by selling all of the Membership Interests to Purchaser;

**WHEREAS**, as an additional inducement to the Seller to enter into this Agreement and the transactions contemplated hereby, the Purchaser is willing to grant to the Seller, at the Closing, a first lien pledge of and security interest (the "**Pledge**") in and to the Membership Interests after Purchaser has taken delivery of the Membership Interests at the Closing, to secure (i) the performance of all the terms and conditions of this Agreement by Purchaser, and (ii) the payment of the Overriding Royalty to be paid after the Closing to Seller by the Purchaser under Article 3 of this Agreement;

**WHEREAS**, the Pledge shall be made and perfected pursuant to a pledge and security agreement by and among the Purchaser as pledgor, the Seller as secured party and beneficiary, with the Membership Interests to be held by Jones & Associates, a law firm, whose address is 13 Kanawha Boulevard, West, Suite 200, Charleston, West Virginia 25302, as collateral agent, (the "**Collateral Agent**"); and,

**WHEREAS**, as an additional inducement to the Seller to enter into this Agreement and the transactions contemplated hereby, an affiliate of the Purchaser, Southern Coal Corporation, a Delaware corporation, ("Southern"), has agreed to irrevocably and unconditionally guarantee (i) the Purchaser's performance of all terms and conditions of this Agreement, (ii) the Purchaser's payment of the Overriding Royalty to be paid after the Closing to Seller by Purchaser under

Section 3 of this Agreement, and (iii) Purchaser's performance under any other agreement contemplated hereunder, pursuant to Section 2.03 hereof.

**WHEREAS**, the Seller and the Purchaser have determined that the purchase and sale of the Membership Interests, pursuant to the terms and conditions set forth in this Agreement, is in their best interests, respectively.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties agree as follows:

### Article I.        Construction & Interpretation.

Section 1.01    Undefined Terms.

All capitalized terms used herein and not otherwise defined shall have the meanings given to them in the in the Operating Agreement of Newgate dated as of July 20, 2010, as amended (the "Operating Agreement").

Section 1.02    Definitions.

(a)      "Acquired Assets" means collectively, all the individual items of both personal and real property now owned and/or leased by Newgate, including, without limitation, all owned or leased property relating to the Three Marie Mine, (including,  in particular, the Coal Lease), all as more specifically identified and described on Exhibit A attached hereto.

(b)      "Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

(c)      "Agreement" is defined in the Preamble of this Agreement.

(d)      "Amended Coal Lease" is defined in Section 2.03 of this Agreement.

(e)      "Closing" is defined in Section 2.02 of this Agreement.

(f)      "Closing Date" is defined in Section 2.02 of this Agreement.

(g)      "Coal Lease" means that certain Lease dated February 1, 2011 by and between Beaver Coal Company, Limited, a Pennsylvania limited partnership, and Newgate.

(h)      "Code" is defined in Article V(p) of this Agreement.

(i)      "Collateral" is defined in Section 3.02 of this Agreement.

(j)      "Collateral Agent" is defined in the fifth recital of this Agreement.

**EXECUTION COPY**

(k)    "Disclosure Schedule" means the Disclosure Schedule, so designated, and dated as of the date hereof, and as updated by Seller on the closing date, delivered to the Purchaser by the Seller, which are a part of this Agreement. By this reference, the Disclosure Schedule, as updated on the closing date, is fully incorporated herein. Disclosure of a matter on the Disclosure Schedule for one section of this Agreement or purpose shall be deemed disclosure by Seller for all sections and purposes of the Agreement.

(l)    "Encumbrance" means a pledge, lien, security interest, mortgage, charge, or other financial encumbrance of any kind.

(m)    "Environmental Laws" means all applicable laws promulgated by any Governmental Authority which require or relate to: (a) advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencement of activities, such as resource extraction or construction, that could have a significant impact on the environment; (b) preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the environment; (c) reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated; (d) assuring that products are designed, formulated, packaged and used so that they do not present unreasonable risks to human health or the environment; (e) protecting resources, species or ecological amenities; (f) reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil or other potentially harmful substances; (g) cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean-up or prevention; or (h) making responsible parties pay private parties, or groups of them, for damages done to their health or the environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets, and, without limitation, shall include SMCRA and all related regulatory programs of any Governmental Authority. "Governmental Authority" means any United States federal, state or local governmental, regulatory or administrative authority, agency or commission of any court, tribunal or judicial body.

(n)    "Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority to Newgate on or prior to the date of this Agreement with respect to Newgate, the Permits or the Leased Reserves.

(o)    "Guaranty Agreement" is defined in Section 2.03 of this Agreement.

(p)    "Indemnified Party" is defined in Section 10.03 of this Agreement.

(q)    "Indemnifying Party" is defined in Section 10.03 of this Agreement.

(r)    "Knowledge of Seller" means to the actual knowledge of Thomas K. Lampert.

(s)    "Law" means any federal, state, local or foreign statue, law, ordinance, regulation, rule, code or other requirement or rule of law in effect on the date of this Agreement, unless another date is specified.

(t)    "Leased Reserves" means all of the merchantable and mineable coal reserves that are leased to Newgate pursuant to the Coal Lease.

(u)    "Losses" is defined in Section 10.03 of this Agreement.

(v)    "Membership Interests" is defined in the first recital of this Agreement.

(w)    "Mining Data" is defined in Article IV(f).

(x)    "Newgate" is defined in the first recital of this Agreement.

(y)    "Operating Agreement" is defined in Section 1.01 of this Agreement.

(z)    "Overriding Royalty Agreement" is defined in Section 2.03 of this Agreement.

(aa)    "Parties" is defined in the Preamble of this Agreement.

(bb)    "Party" is defined in the Preamble of this Agreement.

(cc)    "Permits" means P-303410, WV1026488, and S-301411.

(dd)    "Permits Transfer Forms" is defined in Section 2.04 of this Agreement.

(ee)    "Permitted Liens" means (i) liens for current real and personal property taxes not yet due and payable, and (ii) those Encumbrances, imperfections of title, easements (including easements for power lines, telephone lines, and railways), rights-of-way, servitudes, conditions, covenants and restrictions, if any, which (a) are of public record excepting liens securing or evidencing indebtedness of the Seller, (b) are not substantial in character, amount or extent and do not materially detract from the value of the Acquired Assets, (c) do not materially interfere with the use of the Acquired Assets for coal mining purposes, (d) are encumbrances or obligations of which the Seller has given Purchaser actual notice thereof, (e) are encumbrances visible on the ground or otherwise disclosed by an examination of Leased Reserves or an accurate survey thereof, or (f) are encumbrances which arise from the acts or omissions of a third party unrelated to any act or omission of Newgate.

(ff)    "Permittee" means a Person issued a Permit or Permits.

(gg)    "Permittees" means the Persons issued a Permit or Permits.

(hh)    "Perpetual Representations" is defined in Section 10.05 of this Agreement.

**EXECUTION COPY**

(ii)      "Person" means an individual, corporation, partnership, limited liability company, joint venture, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Securities Exchange Act 1934, as amended), trust, association or other legal entity.

(jj)      "Pledge" is defined in the fourth recital of this Agreement.

(kk)     "Pledge Agreement" is defined in Section 2.03 of this Agreement.

(ll)      "Pre-Closing Tax Period" is defined in Section 7.01 of this Agreement.

(mm)    "Pre-mining Activities" is defined in Section 2.05(b) of this Agreement.

(nn)     "Purchase Price" is defined in Section 3.01 of this Agreement.

(oo)     "Purchaser" is defined in the Preamble of this Agreement.

(pp)     "Purchaser Permit Approval Obligation" is defined in Section 2.05(a) of this Agreement.

(qq)     "Seller" is defined in the Preamble of this Agreement.

(rr)      "SMCRA" means the Surface Mining Control and Reclamation Act of 1977, as amended.

(ss)     "Southern" is defined in sixth recital of this Agreement.

(tt)      "Straddle Period" is defined in Section 7.01 of this Agreement.

(uu)     "Tax" or "Taxes" means all income, gross receipts, gains, sales, use, employment, franchise, profits, excise, property, value added or other taxes, fees, stamp taxes and duties, assessments or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and penalties, additions to tax or additional amounts with respect thereto, imposed by any taxing authority.

(vv)     "Tax Return" means any return (including any information return), report, statement, schedule, notice, form, declaration, claim for refund or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any applicable law or regulation relating to any Tax.

(ww)    "Three Marie Mine" is defined in the second recital of this Agreement.

(xx)     "Transaction" is defined in the second recital of this Agreement.

(yy)   "Trust Agreement" means that certain instrument dated January 9, 2012 by and between Thomas K. Lambert, a resident of Pennsylvania, and Thomas K. Lampert, as Trustee of the Thomas K. Lampert Irrevocable Trust, an irrevocable trust established under the laws of the Commonwealth of Pennsylvania.

(zz)   "WVDEP" is defined in Section 2.04 of this Agreement.

### Article II.     Purchase and Sale; Closing and Post-Closing.

Section 2.01   Purchase and Sale.

Subject to the terms and conditions set forth in this Agreement, the Seller hereby conveys, sells and assigns to the Purchaser, and the Purchaser hereby purchases from the Seller, the Membership Interests as of the Closing Date (as hereinafter defined).

Section 2.02   Closing.

The purchase and sale of the Membership Interests as contemplated hereby and delivery of the same unto Purchaser, and related transactions as contemplated hereby, (collectively, the "Closing"), shall take place on the date of and simultaneously with the execution of this Agreement, (the "Closing Date"), at the Offices of Jones & Associates, 13 Kanawha Blvd., West, Suite 200, Charleston, West Virginia.

Section 2.03   Interparty Closing Deliveries.

At the Closing, simultaneously with the payment of a portion of the Purchase Price pursuant to Section 3.01(a), Newgate shall execute, and Seller and Purchaser shall deliver to the Lessor of the Coal Lease, in final form and substance satisfactory to said Lessor, a fully executed Amendment to Coal Lease substantially in the same form attached hereto as Exhibit C (the "Amended Coal Lease"); (ii) Purchaser and Seller shall execute and deliver the Overriding Royalty Agreement in substantially the same form and upon the same terms and conditions attached hereto as Exhibit B (the "Overriding Royalty Agreement"); (iii) Southern shall execute and deliver to the Seller the Guaranty Agreement, in substantially the same form and upon the same terms and conditions attached hereto as Exhibit D (the "Guaranty Agreement"); and (iv) the Purchaser and Seller shall execute and deliver the final Pledge Agreement in substantially in the same form and upon the same terms and conditions attached hereto as Exhibit E (the "Pledge Agreement")..

Section 2.04   Governmental Closing Deliveries.

At the Closing, or following the Closing as soon as reasonably possible (but not longer than five (5) business days), Seller shall cooperate and execute and deliver for filing by Purchaser, the Permits Transfer Forms listed on Schedule 1(d) (the "Permits Transfer Forms") with the West Virginia Division of Environmental Protection ("WVDEP").   The Permits

Transfer Forms shall be properly prepared by Purchaser, and sufficient to obtain approval of the change of control from Seller to Purchaser with respect to the Permits. When preparing the Permit Transfer Forms, Purchaser shall prepare such forms using the most expeditious application procedures for the transfer of all of the Permits as promulgated by the WVDEP. Seller shall cooperate with Purchaser's preparation, execution and delivery of the Permits Transfer Forms and such other reasonable instruments of ownership and control transfer, conveyance, assignment and confirmation and take such reasonable actions as may reasonably be necessary or desirable in order to more effectively consummate the Transaction.

Section 2.05   Post-Closing Covenants

(a)   After the Closing, Purchaser shall promptly and diligently pursue approval by the WVDEP of all Permits Transfer Forms, which approval shall be completed in its entirety before the expiration of ninety (90) calendar days following the Closing ("Purchaser Permit Approval Obligation").   In determining whether Purchaser has satisfied the Purchaser Permit Approval Obligation, time shall be of the essence. In the event Purchaser has not satisfied the Purchaser Permit Approval Obligation upon the expiration of ninety (90) calendar days following the Closing, Purchaser shall, upon such date, pay to Seller the Accelerated Royalty Amount I (as defined by the Overriding Royalty Agreement). The failure of Purchaser to timely satisfy the Purchaser Permit Approval Obligation or, if applicable, in the alternative, to make the Accelerated Royalty Payment I, shall be a material event of default under this Agreement. Purchaser and Seller acknowledge that it is inherently difficult to determine the opportunity costs and consequential damages to Seller in the event that Purchaser (i) is unable to satisfy the Purchaser Permit Approval Obligation and (ii) does not make payment of the Accelerated Royalty Payment I when it is due. Therefore, accordingly, Purchaser and Seller agree (i) that no part of the Purchase Price shall be refundable to Purchaser in the event that Purchaser does not satisfy the Purchaser Permit Approval Obligation or, in the alternative, pay the Accelerated Royalty Payment I when it is due, and, (ii) that the entire amount Purchase Price that has been paid shall be retained by Seller.

(b)   After the Closing, but before completing the Purchaser Permit Approval Obligation, Purchaser shall promptly and diligently pursue all necessary and proper pre-mining activities, such as road building, bench preparation and the like ("Pre-mining Activities") to the extent that such Pre-Mining Activities are permissible by applicable law, including without limitation laws administered by the WVDEP, and conducted in accordance with the Coal Lease. Additionally, at the conclusion of the Pre-mining Activities, Purchaser may begin mining activities to the extent such activities are permissible under applicable law, including, without limitation laws administered by the WVDEP, and conducted in accordance with the Coal Lease. If the approval by Purchaser fails to timely satisfy the Purchaser Permit Approval Obligation or, in the alternative, to pay the Accelerated Royalty Payment I when it is due, Purchaser agrees that all Pre-mining Activities and mining activities conducted by Purchaser, prior to that

determination, have been done so at Purchaser's own risk, and Purchaser shall be entitled to no compensation of any kind to the extent that the Pre-mining Activities have improved the Three Marie Mine or the Coal Lease. At all times after the Closing, the Purchaser shall cause Newgate to conduct the Pre-Mining Activities and the subsequent mining activities upon the Leased Reserves pursuant to the Permits in compliance in all material respects with (i) all applicable laws, regulations and rules of any and all governmental authorities have jurisdiction thereof, (ii) the Permits, and, (iii) any other licenses of Newgate. Purchaser shall cause Newgate to cure and abate any notices of violation or other notices of non-compliance received from any governmental authority as soon as reasonably possible and shall promptly pay any fines or penalties resulting therefrom.

(c)     At any time after Purchaser has satisfied the Purchaser Permit Approval Obligation or has paid the Accelerated Royalty Payment I, it shall be a material event of default under this Agreement if Newgate is permit blocked pursuant to the Applicant Violator System administered by WVDEP such that Newgate is in default under the terms and conditions of the Coal Lease, or is prevented from mining coal on premises identified by the Coal Lease.

### Article III.     Consideration and Purchase Price; Pledge and Pledge Agreement.

Section 3.01   Purchase Price.

In consideration for the sale, conveyance and transfer and delivery of the Membership Interests to the Purchaser, and in reliance upon the representations and warranties made herein by Seller, the Purchaser shall pay, in accordance with this Section, the purchase price (the "Purchase Price"), and other items, payable as follows:

(a)     At Closing, Purchaser shall pay Seven Hundred Fifty Thousand Dollars ($750,000) to Seller, in cash or other readily available funds, as directed by the order of Seller on the Closing Date.

(b)     In addition, at Closing, Purchaser shall transfer Seven Hundred Fifty Thousand Dollars ($750,000) to the Collateral Agent , in cash or other readily available funds.The Collateral Agent shall hold said $750,000 until the earliest of (i) the commencement of the mining of coal by Newgate upon the Leased Reserves, (ii) completion of the Purchaser Permit Approval Obligation, or (iii) thirty (30) days following the Closing Date; and, upon the occurrence of (i), (ii), or (iii), whichever occurs first, the Collateral Agent, shall transfer said $750,000.00 to Seller.

(c)     At Closing, Purchaser shall pay Eleven Thousand Five Hundred Forty Dollars ($11,540.00) to the Seller to reimburse Seller for the cash posted by Seller pursuant to bonding requirements set by the WVDEP ($500 for P-303410 and $11,040 for S-301411).

(d)     Purchaser shall pay to Seller the Overriding Royalty upon terms and conditions set forth in the Overriding Royalty Agreement  The failure of Purchaser to pay the Overriding Royalty within ten (10) days written notice by Seller an amount due to Seller under the Overriding Royalty Agreement shall be a material event of default by Purchaser under this Agreement.

(e)     Purchaser shall pay to Seller Invoices 1368, 1378, 1390, 1452, and 1462 issued to Infinity Energy by Golconda Inc, all of which total Seven Thousand Five Hundred Dollars ($7,500) in aggregate; and Invoices 1367, 1379, 1391, 1453, and 1463 issued to Sequoia Energy, LLC by Golconda, Inc., all of which total Eight Thousand Seven Hundred Fifty Dollars ($8,750.00) in aggregate..

Section 3.02   Pledge Agreement.

To secure the Purchaser's obligations to (i) perform the terms and conditions of this Agreement and (ii) make the payments under the Overriding Royalty Agreement, the Purchaser shall enter into the Pledge Agreement and therein shall grant to the the Seller, as secured party, a security interest in and continuing lien on, all of the Purchaser's right, title and interest in, to and under the Membership Interests then owned or existing or thereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "Collateral").  For so long as the Pledge is in effect, the Purchaser shall not (i) encumber the Collateral, or (ii) allow Newgate to become permit blocked pursuant to the Applicant Violator System administered by WVDEP such that Newgate is in default under the terms and conditions of the Coal Lease, or is prevented from mining coal on premises identified by the Coal Lease  The Pledge shall remain in effect until exhaustion of all of the Leased Reserves.

Section 3.03   Further Assurances.

In addition to the rights reserved unto Seller under the Pledge Agreement, the Purchaser agrees to promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary in order to create and/or maintain the validity and perfection of, and protect any security interest contemplated hereby or to enable the Seller to exercise and enforce its rights and remedies hereunder with respect to the Collateral.   In furtherance of assisting the Seller in exercising and enforcing its rights and remedies in connection with the Pledge Agreement, the Purchaser hereby appoints Seller as its attorney-in-fact for the limited purpose of executing and delivering all instruments and documents necessary, and taking such other actions as are necessary, to effectuate a change of control under the applicable rules and regulations of the WVDEP and other Governmental Authorities if Purchaser defaults under Pledge Agreement and Seller desires to regain control of Newgate and subsequently mine the Leased Reserves.

## Article IV.    Representations and Warranties of the Purchaser.

The Purchaser represents and warrants to the Seller that:

(a)    The Purchaser is (i) a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction, (ii) is duly qualified to transact business as a foreign corporation, if applicable, and is in good standing in all states in which it holds properties or conducts any material business and in which a failure to so qualify could have a material adverse effect on the business, condition or properties of the Purchaser.

(b)    The Purchaser has all necessary legal and corporate power and authority to execute, deliver and perform each of its obligations under the terms of this Agreement.  The execution and performance of this Agreement have been duly authorized by the Purchaser.  This Agreement has been duly executed and delivered by the Purchaser, and constitutes the valid and binding obligation of the Purchaser, enforceable against it in accordance with its term, except as may be affected by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting enforcement of creditors' rights, and (ii) the application of equitable principles by a court of appropriate jurisdiction.

(c)    The execution, delivery and performance of this Agreement by the Purchaser, and the transfer of the Membership Interests in accordance with the terms hereof, does not violate the certificate of incorporation or bylaws of the Purchaser, or any contract, agreement, order, judgment or the like that is binding on the Purchaser.

(d)    The Purchaser is not insolvent, and will not be rendered insolvent as a result of the transactions effected by it on the Closing Date.

(e)    The Purchaser has not utilized any finder or broker in connection with this Agreement.

(f)    Purchaser has reviewed relevant geological data, reserve data, mine maps, core hole logs and associated data, coal measurements, coal samples, lithologic data, coal reserve calculations and reports, washability analyses or reports, mine plans, mining permit applications and supporting data, engineering studies and all other information, maps, reports and data in the possession of Seller relating to or affecting the Acquired Assets, including the coal reserves, coal ownership, the Coal Lease, mining conditions, and mining plans as prepared and utilized by Newgate in its business (collectively the "Mining Data"). NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE PURCHASER ACCEPTS THE ACQUIRED ASSETS, AS IS, WHERE IS, TOGETHER WITH THE MINING DATA, FREE OF ANY WARRANTY (EXPRESS OR IMPLIED) WITH REGARD TO THE MINEABILITY, WASHABILITY, RECOVERABILITY, MINING RIGHTS, VOLUME, LOCATION, QUANTITY OR QUALITY OF ANY OF THE COAL RESERVES.

(g)     Purchaser has reviewed all information and data in the possession of Seller with respect to the Permits and the environmental conditions of the Leased Reserves and that Purchaser has examined such data and information to its satisfaction. Purchaser acknowledges that it understands that the mining operations at the Three Marie Mine as allowed by the Permits is a remining operation upon a previously mined site and that no active mining operations have been conducted thereon by Newgate pursuant to the Permits or the Coal Lease. AS SUCH, NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE PURCHASER ACCEPTS THE ACQUIRED ASSETS, AS IS, WHERE IS, TOGETHER WITH THE PERMITS AND ENVIRONMENTAL OBLIGATIONS AND CONDITIONS ASSOCIATED THEREWITH, FREE OF ANY WARRANTY (EXPRESS OR IMPLIED) WITH REGARD TO ANY ENVIRONMENTAL CONDITION OR OBLIGATION..

(h)     No representation or warranty made by the Purchaser in this Agreement or in any certificate, list, exhibit, schedule or other instrument specified in this Agreement, whether heretofore furnished to the Seller, contains any untrue statement of a material fact, and no statement or information hereafter required to be furnished to the Sellerr under the terms of this Agreement will contain any untrue statement of a material fact.

(i)     Purchaser has the financial resources and ability to consummate the Transaction and to operate the Acquired Assets in the normal course of business until Purchaser has fulfilled all of its obligations to Seller pursuant to this Agreement and the other documents executed as a part of the consummation of the Transaction. Purchaser covenants that it will operate the Acquired Assets in the normal course of business after the Closing and will not assign, sell or otherwise in any way transfer any of the material Acquired Assets, without the prior written consent of Seller, which Seller may withhold in its sole discretion if Seller believes that the disposal of such part or all of the Acquired Assets may impair the performance of Purchaser's obligations to Seller pursuant to this Agreement or any of the other documents executed as a part of the consummation of the Transaction.

### Article V.     Representations and Warranties of the Seller.

The Seller represents and warrants to the Purchaser that:

(a)     Newgate is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction, and has not transacted any business as a foreign limited liability company, held any properties or interests in properties, or conducted any material business, respectively, in any jurisdiction other than West Virginia.

(b)     Newgate does not have any subsidiaries and does not own any capital stock, membership interests or other equity interests in any entity.

(c)     The Acquired Assets are all of the permits and leased reserves held by Newgate for the Three Marie Mine, and Seller holds no other permits or coal reserves associated with the Three Marie Mine.

(d)     Newgate has all necessary legal and corporate power and authority to hold the Coal Lease and the Permit(s) and is not in material default of any provision thereof or requirement thereunder as of the Closing Date.

(e)     The Seller has all necessary legal power and authority to execute, deliver and perform each of Seller's obligations under the terms of this Agreement.  This Agreement has been duly executed and delivered by the Seller, and constitutes the valid and binding obligation of the Seller, enforceable against each Seller in accordance with its term, except as may be affected by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting enforcement of creditors' rights, and (ii) the application of equitable principles by a court of appropriate jurisdiction.

(f)     The execution, delivery and performance of this Agreement by the Seller, and the transfer of the Membership Interests in accordance with the terms hereof, do not violate the articles of organization or limited liability company operating agreement of Newgate, or any contract, agreement, order, judgment or the like that is binding on the Seller.

(g)     There is no litigation pending against, or, to the Knowledge of the Seller, threatened against Newgate, the Acquired Assets, or the Seller, and, to the Knowledge of the Seller, there is no basis for any such litigation.  There are no outstanding Governmental Orders to which Newgate is a party. Newgate and the Seller have not received and are not aware of any notice or other document from any Governmental Authority threatening to issue any Governmental Order, directly relating or applicable to either Seller or to Newgate or to any of its or their respective assets, properties or businesses, including the Three Marie Mine, that would have a material adverse effect upon Newgate or the business of Newgate.

(h)     Newgate owns and holds all of its right, title and interest in and to the Acquired Assets, including all right, title and interest to the Leased Reserves, as lessee under the Coal Lease, free and clear of all Encumbrances, except Permitted Liens.

(i)     The Permits are in full force and effect for the Three Marie Mine.

(j)     The Acquired Assets are sufficient for the continued conduct of the Three Marie Mine and Newgate's business after the Closing Date in substantially the same manner as conducted prior to the Closing Date.

(k)     Other than as set forth in the Disclosure Schedule attached hereto, the Seller has no Knowledge of any fact or circumstance relating to the business and operations of Newgate that is a violation of any currently applicable Environmental Laws (including but not limited to

SMCRA and state regulatory programs thereunder or relating thereto) that could reasonably be expected to have a material adverse effect on the business, assets and operations of Newgate including, but not limited to, the Three Marie Mine.

(l)     The Seller owns outright and has good and marketable title to the Membership Interests, free and clear of all Encumbrances, other than the restrictions on transfer of Membership Interests set forth in the Operating Agreement and the Trust Agreement.  The Membership Interests shall be transferred to the Purchaser free and clear of Encumbrances.

(m)     The Seller and Newgate have not utilized any finder or broker in connection with this Agreement.

(n)     Seller and Newgate are in compliance in all material respects with all laws of federal, state, local and foreign governmental authorities applicable to the Seller or to Newgate and to the business(es) and assets of Newgate.

(o)     After the Closing Date, Newgate shall have no liabilities, obligations, claims or losses (whether liquidated or unliquidated, secured or unsecured, absolute, accrued, contingent or otherwise) except for ones (i) related to the Permits and the Coal Lease being assumed by Purchaser, (ii) accrued in the ordinary course of business since January 1, 2013, or (iii) assumed by this Agreement or any other document executed in connection with the Transaction.

(p)     From the date of its organization, Newgate has been taxed and treated as a partnership under subchapter K or the Internal Revenue Code, as amended, (the "Code"), for federal and/or state income tax purposes.  Newgate has filed all Tax Returns that it was required to file under applicable Tax laws and regulations. All such Tax Returns were correct and complete in all respects and have been prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been paid. The Company is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company. As of the Closing Date, the Company will have paid all Taxes (other than Taxes not yet due and payable)

(q)     Other than as set forth in the Disclosure Schedule attached hereto, there are no Contracts between, among or otherwise involving Newgate, on the one hand, and the Seller, or any of its officers, directors, members or Affiliates, on the other hand.

(r)     Newgate has not sold, assigned, transferred, conveyed or leased any of its real property or interests therein, including any interest under the Coal Lease

(s)     all the books and records of Newgate fully and accurately reflect all material transactions and business activities of Newgate since its formation.

(t)     No representation or warranty made by the Seller in this Agreement or in any certificate, list, exhibit, schedule or other instrument specified in this Agreement, whether heretofore furnished to the Purchaser, contains any untrue statement of a material fact, and no statement or information hereafter required to be furnished to the Purchaser under the terms of this Agreement will contain any untrue statement of a material fact.

### Article VI.    Termination of Seller's Related Party Agreements.

All agreements between Newgate, on the one hand, and the Seller or any of the Seller's respective Affiliates, on the other hand, including those set forth on the Disclosure Schedule, shall be terminated on the Closing Date.

### Article VII.    Taxes.

The following provisions shall govern the allocation of responsibility as between Purchaser and Seller for certain tax matters following the Closing Date:

Section 7.01    Straddle Period.

In the case of any Taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income or receipts of the Newgate for the period occurring prior to the Closing Date (the "Pre-Closing Tax Period") shall be determined based on an interim closing of the books as of the close of business on the Closing Date and the amount of other Taxes of the Newgate for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

Section 7.02    Responsibility for Filing Tax Returns.

Seller shall prepare or cause to be prepared at Seller's cost and file or cause to be filed the income Tax Returns related to the Pre-Closing Period, but shall provide a copy of such return to Purchaser at least ten (10) days prior to the filing deadline and give Purchaser an opportunity to provide comments with respect to such Tax Returns. Purchaser shall prepare or caused to be prepared at Purchaser's cost and file or caused to be filed all other Tax Returns for Newgate which are filed after the Closing Date.

Section 7.03    Cooperation on Tax Matters.

Purchaser and Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to Section 7.02 and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Purchaser (and Purchaser shall cause Newgate), and Seller agree (i) to retain all books and records with respect to Tax matters pertinent to Newgate relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Purchaser or Seller, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, Seller and Purchaser shall cause Newgate to, as the case may be, allow the other Party to take possession of such books and records.

Section 7.04    Tax Sharing Agreements.

All Tax sharing agreements or similar agreements with respect to or involving Newgate shall be terminated as of the Closing Date and, after the Closing Date, Newgate shall not be bound thereby or have any liability or right to any benefit thereunder with respect to any period.

Section 7.05    Certain Taxes and Fees.

Except as otherwise provided in this Agreement, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement shall be paid by Seller when due, and Seller will, at Seller's own expense file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, Purchaser will, and will cause its Related Persons to, join in the execution of any such Tax Returns and other documentation.

Section 7.06    Refunds and Tax Benefits.

Any Tax refunds that are received by Purchaser or Newgate, and any amounts credited against Tax to which the Purchaser or Newgate become entitled, that relate to Pre-Closing Tax Periods shall be for the account of the Seller, and Purchaser shall pay over to Seller any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto.

Section 7.07    Transaction Related Taxes.

All local, state and federal taxes due or becoming due as a result of the transactions contemplated hereby shall be paid by Seller.

### Article VIII.   Refunds Relating to Services Rendered Prior to Closing Date

Purchaser hereby covenants and promises to pay over to Seller, within fifteen (15) days after receipt or entitlement thereto, any refunds that are received by Purchaser or Newgate after the Closing Date, or any amounts credited against amounts owed by Purchaser or Newgate after the Closing Date, that represent overpayments for services rendered to Seller or Newgate prior to the Closing Date, including, without limitation, refunds associated with insurance policies in effect prior to the Closing Date.

### Article IX.    Notices.

Any notices required or permitted to be given hereunder shall be given in writing and delivered in person or sent by postage prepaid, United States certified mail return receipt requested, to the respective parties at their addresses given below or at such other addresses as may hereafter be designated by such party in writing to the other parties.

| | |
|---|---|
| To the Purchaser: | TAMS Management, Inc.<br>Attention: James C. Justice III<br>302 S. Jefferson St<br>Roanoke, VA 24011 |
| With a copy to: | Steve Ball<br>Justice Companies<br>302 S. Jefferson Street<br>Roanoke, VA 24011 |
| To the Sellers: | Thomas K. Lampert Irrevocable Trust<br>114 Bremen Lane<br>McMurray, PA 15317<br>Attn: Thomas K. Lampert, Trustee |
| With a copy to: | E. Forrest Jones, Jr., Esq.<br>Jones & Associates<br>P.O. Box 1989<br>Charleston, West Virginia 25327 |

**EXECUTION COPY**

## Article X.    Indemnification.

Section 10.01  <u>Seller's Obligation to Indemnify Purchaser</u>.

The Seller shall indemnify and hold harmless the Purchaser, and the Purchaser's officers, directors and shareholders, from and against any and all losses, costs, damages or expense, including, without limitation, reasonable attorneys' fees and costs (collectively, "<u>Losses</u>") suffered or incurred, directly by the Purchaser arising out of or related to any misrepresentation or breach of the representations or warranties of the Seller set forth in this Agreement, or the nonfulfillment or failure to perform any covenant or agreement on the part of Seller under this Agreement.

Section 10.02  <u>Purchaser's Obligation to Indemnify Seller</u>.

The Purchaser shall indemnify and hold harmless the Seller, and the Seller's officers, directors, members, successors and permitted assigns from and against any and all Losses suffered or incurred, directly by the Seller arising out of or related to any misrepresentation or breach of the representations or warranties of the Purchaser set forth in this Agreement, or nonfulfillment or failure to perform any covenant or agreement on the part of the Purchaser under this Agreement.  In the event that the Seller reacquires the Membership Interests pursuant to the Pledge Agreement, the Purchaser shall indemnify and hold harmless the Seller, and the Seller's officers, members, successors and permitted assigns from and against any and all Losses suffered or incurred, directly by the Seller arising out of or related to any acts or omissions that occur during the Purchaser's ownership of the Membership Interests.

Section 10.03  <u>Notice of Indemnification</u>.

Whenever any claim shall arise for indemnification hereunder, the Party seeking indemnification (the "<u>Indemnified Party</u>"), shall promptly notify the Party from whom indemnification is sought (the "<u>Indemnifying Party</u>") of the claim and, when known, a summary of the facts constituting the basis for such claim; <u>provided</u>, <u>however</u>, that, subject to the time limitations within which claims for indemnification must be made, no delay in notifying the Indemnifying Party or providing such summary shall relieve the Indemnifying Party from its obligations hereunder unless (and only to the extent) the Indemnifying Party is actually prejudiced by such delay. In the event of any such claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third-party, the notice to the Indemnifying Party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.  The Indemnified Party shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld, unless suit shall have been instituted against it and such the Indemnifying Party shall not take control of such suit after notification thereof as provided in this Agreement.

Section 10.04 <u>Miscellaneous</u>.

In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement, but excluding any such claim or proceeding if it seeks or could otherwise result in equitable relief against the Indemnified Party, the Indemnifying Party at its sole cost and expense may, upon written notice to the Indemnified Party, assume the defense of any such claim or legal proceeding if it acknowledges to the Indemnified Party in writing its obligations to indemnify the Indemnified Party with respect to all elements of such claim. The Indemnified Party shall be entitled to participate in (but not control) the defense of any such action, with its counsel and at its own expense. If the Indemnifying Party does not assume the defense of any such claim or litigation resulting therefrom within 30 days after the date such claim is made and notice is received requesting indemnification, (a) the Indemnified Party may defend against such claims or litigation, in such manner as it may deem appropriate, and (b) the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense. If the Indemnifying Party thereafter seeks to question the manner in which the Indemnified Party defended such third Party claim or the amount or nature of any such settlement, the Indemnifying Party shall have the burden to prove by a preponderance of the evidence that the Indemnified Party did not defend or settle such third party claim in a reasonably prudent manner.

Section 10.05 <u>Expiration of Indemnification Obligations</u>.

All representations and warranties made by the Parties herein, or in any schedule, certificate or exhibit furnished in connection herewith, shall survive the Closing and shall expire on the second anniversary of the Closing Date, except for claims, if any, asserted in writing prior to such second anniversary, which shall survive until finally resolved and satisfied in full; provided, however, that the representations and warranties contained in Articles 4(a)-(c) and Articles 5(c)-(f) and Article 5(p)(the "<u>Perpetual Representations</u>") shall not expire and shall survive indefinitely. Notwithstanding anything to the contrary in this Section, neither party shall have any liability to the other hereunder arising out of a breach of a representation or warranty, other than a Perpetual Representation, until all claims for indemnification that such party is seeking exceed $100,000 in the aggregate, in which event the Indemnifying Party shall indemnify the Indemnified Party for all amounts for which indemnity is properly and timely sought thereafter (including the initial $100,000), and for no amount greater than $3,000,000 in the aggregate; provided, however, Seller shall have no obligation to indemnify an Indemnified Party in an amount greater than the aggregate amount of the Purchase Price paid to Seller at the Closing plus the amount of any payments of the Overriding Royalty that have actually been paid to Seller at the time of indemnification. None of the caps, baskets, time limits or other restrictions on indemnification contained in this Section shall apply to a claim arising out of a breach of a Perpetual Representation or out of the nonfulfillment or failure to perform any

covenant or agreement under this Agreement; provided, however, Seller shall have no obligation to indemnify an Indemnified Party in an amount greater than the aggregate amount of the Purchase Price paid to Seller at the Closing plus the amount of any payments of the Overriding Royalty that have actually been paid to Seller at the time of indemnification.

Section 10.06 Limitation of Remedies.

The indemnification remedies provided for in Section 8 of this Agreement shall be the sole and exclusive remedy for the Parties with respect to any claim under this Agreement, other than for fraud.

## Article XI.    Miscellaneous.

This Agreement, and all documents, instruments, and exhibits executed in connection with the Transaction (a) may be executed in any number of counterparts, each of which counterparts may be a single document executed by all Parties or may be more than one document so long as the documents in the aggregate contain the signatures of all of the Parties, and each of which counterparts shall be deemed to be an original, and all of which counterparts together shall constitute one and the same instrument; (b) constitute the entire agreement of the parties with respect to its subject matter, superseding all prior oral or written communications, proposals, negotiations, representations, understandings, course of dealing, agreements, contracts and the like between the Parties; (c) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by all Parties; (d) contains headings only for convenience of the Parties, which headings do not form part, and shall not be used in construction, of this Agreement; (e) may not be assigned without the prior written consent of each Party; and (f) shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns.

## Article XII.    Governing Law; Jurisdiction and Venue.

This Agreement shall be governed by the internal laws of the State of West Virginia without regard to its conflicts-of-laws principles. The Purchaser and the Seller hereby agree that any legal proceeding instituted to enforce their respective rights under this Agreement will be brought in the U.S. federal courts situated in the Southern District of West Virginia, unless such federal courts do not have jurisdiction over such legal proceeding, whereby the legal proceeding must be brought in the state courts of the State of Virginia. Each Party submits to personal jurisdiction in such federal or state courts, as the case may be, and irrevocably waives any objection as to venue therein, and further agrees not to plead or claim in any such court that any such proceeding has been brought in an inconvenient forum.

## Article XIII.   Expenses.

Each Party will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first set forth above.

Purchaser:                                    Seller:

**TAMS MANAGEMENT, INC.,**          **THOMAS   K.   LAMPERT   IRREVOCABLE**
a West Virginia corporation                  **TRUST,**
                                             an irrevocable trust established on January 9, 2012
                                             under the laws of the Commonwealth of
                                             Pennsylvania

By: _____          By: _____
Name: _____          Name: _THOMAS K. LAMPERT_____
Its: _EVP_____          Its: _TRUSTEE_____